# Civil Rights Consortium

July 11, 2025

GRANTED. For all future extension requests, Counsel is reminded of the Court's individual rules regarding extensions.

The Clerk of Court is directed to terminate the motion at Dkt. 91.

SO ORDERED.

Arun Subramanian, U.S.D.J.
Dated: July 14, 2025

**BY ECF**
Hon. Arun Subramanian, U.S.D.J.
United States District Court
Southern District of New York
500 Pearl Street, Courtroom 15A
New York, New York 10007

RE: <ins>Pasinetti *vs*. Icahn School of Medicine at Mt. Sinai,</ins>
    Civil Docket No. 24-07688(AS)

Dear Judge Subramanian,

Please accept the Plaintiff's letter application for an enlargement of time for the Plaintiff's papers in opposition to the Defendants' Motion to Dismiss, in lieu of a more formal application. Plaintiff's opposition was scheduled for July 7, 2025. However, Plaintiff needed additional time for such, and consulted with counsel for the Defendants, obtaining consent to an enlargement of time, enlarging the time from July 7, 2025, to July 12, 2025. Therefore, Plaintiff now, respectfully moves for an enlargement of time to July 12, 2025. This is Plaintiff's first request. In turn, the Defendants' time for reply papers is enlarged to July 25, 2025.

Respectfully Submitted,

*E. Dubois Raynor, Jr.*
Earl Dubois Raynor, Esq.
Managing Attorney

**BY EMAIL & U.S. POSTAL MAIL**
Scott R. Landau, Esq. (slandau@aellaw.com)
Abel Eskew Landau
ATTORNEYS FOR THE DEFENDANTS
256 Fifth Avenue, 5th Floor
New York, New York 10001

# UNITED STATES DISTRICT COURT

## FOR THE

### SOUTEHRN DISTRICT OF NEW YORK

|  |  |
|---|---|
| ) | **Docket No.: 24-cv-07688** |
| **GIULIO MARIA PASINETTI,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| ) | |
| -**against**- ) | |
| ) | |
| **ICAHN SCHOOL OF MEDICINE AT MOUNT** ) | |
| **SINAI, JESSICA MOISE, ERIC J. NESTLER,** ) | |
| **and BARBARA G. VICKREY,** ) | |
| ) | |
| **Defendants,** ) | |
| ) | |
| **NATIONAL INSTITUTES OF HEALTH, and the** ) | |
| **CENTERS FOR DISEASE CONTROL and** ) | |
| **PREVENTION,** ) | |
| ) | |
| **Respondents.** ) | |

### PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S OPPOSITION TO THE DEFENDANT'S MOITONT TO DISMISS

Dated: July 12, 2025
        Woodhaven, New York

Counsel for the
Plaintiff: Giulio Maria Pasinetti
CIVIL RIGHTS CONSORTIUM
        *BY E. Dubois Raynor, Esq. on the brief and oral argument*
                *Joseph Paukman, Esq., of Counsel, on oral argument*
89-07 Jamaica Avenue
Woodhaven, New York 11421
(855) 246-2776 Ext. 804 Telephone

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... ii

PRELIMINARY STATEMENT ............................................................................................... 2

FACTUAL BACKGROUND .................................................................................................... 3

STANDARD OF REVIEW ....................................................................................................... 13

ARGUMENT ............................................................................................................................. 14

CONCLUSION .......................................................................................................................... 20

**TABLE OF AUTHORITIES**

**Cases**

*American Mfrs. Mut. Ins. Co.,*
 *526 U.S.* 40 (1999)

*Ashcroft v. Iqbal,*
 556 U.S. 662 (2009)

*Bell Atl. Corp. v. Twombly,*
 550 U.S. 554 (2007)

*Blum v. Yaretsky, 457 U.S. 991 (1982)*

*Calcutti v. SBU, Inc.,*
 273 F.Supp.2d 488 (S.D.N.Y. 2003)

*Doe v. City of New York,*
 2020 WL 108265 (E.D.N.Y., Jan. 9, 2020)

*Doner v. Ed Adams Contracting Inc.,*
 208 A.D.2d 1072, 617 N.Y.S.2d 565 (N.Y. App. Div. 1994)

*Expeditions Unlimited Aquatic Enterprises, Inc. v. Smithsonian Inst.,*
 566 F.2d 289 (D.C.C. 1977)

*KGK Jewelry LLC v. ESDNetwork,*
 2013 WL 105780 (S.D.N.Y., Jan. 9, 2013)

*LaFaro v. New York Cardiothoracic Grp., PLLC,*
 570 F.3d 471 (2d Cir. 2009)

*Liguori v. Alexander,*
 495 F.Supp. 641 (S.D.N.Y. 1980)

*Lombardo v. Town of Hempstead,*
 2020 WL 7249290 (E.D.N.Y. 2020)

*Miotto v. Yonkers Pub. Sch.,*
 534 F.Supp.2d 422 (S.D.N.Y. 1008)

*Moose Lodge No. 107 v. Irvis,*
 407 U.S. 163 (1972)

*NBT Bancorp., Inc. v. Gleet/Norstar Financial Group, Inc.,*
 87 N.Y.2d 614, 664 N.E.2d. 492, 641 N.Y.S.2d 581 (N.Y. 1996)

*Schurbert v. City of Rye,*
      775 F.Supp.2d 689 (S.D.N.Y. 2011)

*Shelley v. Kraemer,*
      334 U.S. 1, 13 (1948)

*Williams v. Town of Greenburgh,*
      535 F.3d 1 (2d Cir. 2008)

## PRELIMINARY STATEMENT

Plaintiff Giulio Maria Pasinetti moves in opposition to the Defendant's motion to dismiss.[1]

---

[1] The circumstances of the filing of the Second Amended Complaint ("SAC") are unusual. The parties reached an agreement, of sorts to the filing of a second amended complaint. The initial proposed Amended, filed as part of the Plaintiff's combined memorandum of law opposing dismissal and in support of an application to further amend, occurred ahead of the underlying April 28, 2025, Administrative Peer Review Proceedings (hereinafter "APR"). The Court instructed that the Plaintiff's motion to further amend to be filed independently of the Plaintiff's opposition to the motion to dismiss the first amended complaint ("FAC'). Therefore, on May 6, 2025, the Plaintiff filed the underlying motion to further amendment, inadvertently attaching two versions of the proposed amended complaint, the original version that had been initially filed ahead of the APR (*See ECF No. 63-3*), and the most recent version (*See ECF Nos. 63-6, and 73*) that occurred after the APR, which the Plaintiff intended to be the SAC. In a letter dated May 16, 2025 (*See ECF No. 67*), the Defendants write in pertinent part, "We represent defendants…and write to advise the Court that Defendants will not interpose opposition to the [P]laintiff Giulio Maria Pasinett's…May 6, 2025, Second Motion to Further Amend Complaint…Entry No. 63." The letter did not specify whether the Defendants consented to the filing of ECF No. 63-3 or ECF No. 63-6. Therefore, Plaintiff proceeded to file ECF No. 63-6, to which the Defendants then specified that they had consented to the filing of ECF No. 63-3 as the SAC and not the filing of ECF No. 63-6 as the SAC. Plaintiff counsel noted that ECF No. 63-3 would be filed since the Court had issued its order, but that service would be completed on the Respondents and the Plaintiff would move to further amend Complaint and, thereby, triggering additional rather than simultaneous motion practice. Therefore, the Plaintiff files this amendment, and separately moves to further amend the Complaint for purposes of filing ECF No. 63-6.

## FACTUAL BACKGROUND

### (I.)    Initial Background

Plaintiff moves in the instant action for relief against the Defendants for violation of his right to due process, defamation, retaliation in violation of the Plaintiff's first amendment rights, whistleblower retaliation, tortious interference with a contract, and negligent infliction of emotional distress. *Exhibit 1.* The Plaintiff is employed with the Defendant School as an educator, although he is a licensed physician, licensed in Europe, initially commenced the instant proceeding, and related prior proceeding, based on what information previously known to the Plaintiff. The Defendants began their hostile campaign against the Plaintiff sometime about mid-2023, allegedly pursuant to May 2022, newly announced notice from the NIH entitled, *Congress Strengthens NIH's Ability to Address Harassment in NIH-Funded Activities*, which resulted in independent adverse employment action following the Plaintiff's filing of Declaratory Judgment proceedings in *Pasinetti v. Icahn School of Medicine at Mount Sinai, 24-cv-4510 (SDNY)(JMF)* (hereinafter referred as "*Pasinetti I*").

The Defendants recently disclose information, during the underlying April 2025, peer review[2] proceeding that the Plaintiff's discipline at the hands of the Defendants, was and is a joint interest, equally shared by the NIH and the School, which raises due process concerns, as was claimed in *Pasinetti I*. In June 2024, Plaintiff sued Defendant Mount Sinai in *Pasinetti I* for various due process violations. Although employed by the Defendant School, immediately following the Plaintiff's filing of proceedings in *Pasinetti, 24-cv-4510*, Defendants attempted to claim that Plaintiff was not an employee of the Defendant School.

---

[2] During the peer review process, the Defendant explicitly exercised their right to prevent adversarial testing of their underlying claims against the Plaintiff. The Defendants rules provide such discretion, by Defendants' forbidding of the Plaintiff's counsel to question witnesses and test evidence.

The parties in *Pasinetti I* seemed to have resolved the matter and so that action was voluntarily dismissed. However, less than three (3) months following that dismissal, the Defendants continued waging a campaign of a hostile work environment against the Plaintiff and retaliation for his suing in *Pasinetti, 24-cv-4510*, reviving a disciplinary matter that, according to the Defendants had been resolved and disposed pursuant to the Defendant's own instructions. On or about August 28, 2024, the Defendants contacted the Plaintiff and informed the Plaintiff that the Defendants had just completed communication(s) with the NIH, regarding approximately three (2) alleged statements of sexual harassment, in an alleged three (3) separate circumstances, which according to the Defendants, occurred at "off-campus work related [social] events" where staff were drinking alcohol and socializing, and that the NIH had required the Plaintiff's removal, an effective demotion, and loss of income, for which the Plaintiff has received no hearing, either before or following the demotion.

However, as noted herein, Defendants' alleged communication was a lie, feigned for malicious purposes of trying to illegally oust the Plaintiff from his employment. According to the Defendants, Dr. Pasinetti was alleged to have made several statements at an alcohol-infused social event that the Defendants claimed warranted their investigation and punishment of Mr. Pasinetti. In a May 16, 2023, letter ("Disciplinary Recommendation Letter" or "DRL"), the Defendants went on to say, "Human Resources investigated these allegations and interviewed numerous current and former staff members who corroborated that [Mr. Pasinetti] made these offensive statements at work related events off-campus."

Moreover, the DRL went on to conclude in pertinent part, "Accordingly, I recommend that he be issued a final warning and restricted from having staff related events outside the office where alcohol and/or other controlled substances are served. Furthermore, I recommend that the

4

School perform at least quarterly[,] climate reviews of his laboratory for the foreseeable future, and that he also attend a School-offered course related to diversity training or unconscious bias." According to the Defendants' letter, Mr. Pasinetti "[had] been counseled in the past for abusive, retaliatory behavior," in insinuating that the underlying allegations were part of the pattern, going on to say, "His continuation of this behavior warrants progressive discipline." However, the DRL is inconsistent in its allegations, alleging in one instance that all of the alleged statements of sexual harassment occurred off-campus, during alcohol infused social events, while simultaneously alleging that one of the allegations of sexual harassment occurred on campus in the Mr. Pasinetti's laboratory, during work.

In another letter, also dated May 16, 2023, ("Disciplinary Action Letter" or "DAL"), the Defendants stated in pertinent part,

> I am taking this action based on the serious allegations of sexual harassment and unprofessional behavior towards your laboratory staff at work related events off campus. Your prior record of such behavior and counseling for such, the continuing pattern of such unacceptable behavior, and your refusal to acknowledge the unacceptable nature of your behavior warrants disciplinary action in the form of a *final warning*, restrictions on the scope of work events outside the office and closer monitoring of the climate with your laboratory staff. Specifically, you are prohibited from having staff related events inside/outside the office and serving any alcohol and/or other controlled substances at such events. Furthermore, the School will perform regular (at least quarterly) climate reviews of your laboratory for the foreseeable future. Finally, you are also expected to register for and attend at least one unconscious bias training provided by the Office of Diversity and Inclusion within the next six (6) calendar months….
>
> *I also note that this discipline relates solely to the complaints of harassment and abusive behavior. As you know, there is also an ongoing, independent research misconduct investigation[3] and any findings and potential discipline arising from that investigation are entirely separate from this determination.* You have a right to appeal this decision to [the School's] Faculty Discipline Tribunal by written submission to the President of the Faculty Council…The appeal must be submitted by certified mail, postmarked no later than ten (10) business days following your receipt of this letter. If no request for appeal is filed, this discipline will become final.

---

[3] Hereinafter referred to as "Research Misconduct Investigation" or "RMI."

In closing the DAL stated in pertinent part, "Any future similar conduct-related incidents will result in termination of your employment. Finally, if it is discovered that you retaliate in any way with regard to this incident, you will be considered out of compliance with our Code of Conduct, and your will be subject to immediate termination." Mr. Pasinetti registered, took, and completed the six classes of unconscious bias training, as required, irrespective of Mr. Pasinetti's belief that he had done nothing wrong and that the allegations were untrue as alleged.

Therefore, having reviewed [the School's] disciplinary procedure which the DAL echoed, and based upon the DAL's unequivocally stating that "If no request for appeal is filed, this discipline will become final", Mr. Pasinetti believed the matter to have been final and put the matter behind him. According to the DRL and the DAL, the Defendants and Mr. Pasinetti had previously been through such events and processes, with this time, according to the DAL, to be the last and final. However, on or about August 28, 2024, well more than a year after the Defendants had declared the purely internal matter to be final, something different and unusual occurred. In this instance, unlike the other previous allegedly similar events and process, the Defendants summoned Mr. Pasinetti to a meeting, and informed Mr. Pasinetti of a recent communication the Defendants had with NIH, in which the Defendants admitted publishing the DRL and DAL to the NIH.

Moreover, the Defendants alleged that in response the NIH ordered the Defendants to further punish Mr. Pasinetti by restricting his work, effectively placing Mr. Pasinetti in a proverbial rubber room of sorts (i.e., demotion), as he continued to be employed by the Defendants, not only without the ability to do the work that he (i.e., Dr. Pasinetti), is one of few, if not the only expert in his field for the Defendants with the expertise to conduct such work, but also, effectively restricting Mr. Pasinetti from conducting any other work. Defendants'

publication of the DRL and DAL was malicious and done with the intent to destroy Mr.

Pasinetti's reputation as such had never occurred previously, in the other alleged similar

incidences, and where there exists no requirement under the NIH's rules, regulations, and

protocol, to receive that the Defendants published DRL and DAL to the NIH.

Furthermore, Defendants' publication of the DRL and DAL was relation, where such

publication and republication to third parties including the NIH, came on the heels of the

Defendants' flagrant violations of Mr. Pasinetti's due process rights in the above-mentioned

RMI, which had been filed June 12, 2024, before the matter was subsequently revolved and

rendered moot. Furthermore, Defendants' underlying actions constitute a constructive

termination of Mr. Pasinetti's employment, as he has been reduced to nothingness in the

workplace. However, the Defendants' retaliation and hostile work environment did not end here,

where the Defendants in late September 2024 to early October 2024, effectively terminated Mr.

Pasinetti's right and privilege to employ (i.e., hire) staff to work with him at Mount Sinai.

However, in Defendants' initial opposition to the Plaintiff's application or injunctive

relief in the instant action, the Defendants' disclosed for the first time, that Defendants have

informed the NIH that the allegations of sexual harassment were investigative and determined

not to be founded, although Defendants admitted to taking adverse employment action against

the Dr. Pasinetti. In a July 12, 2023, letter correspondence to the Defendants ("NIH's Letter of

Ratification"), provided in Dr. Pasinetti's sham administrative removal proceedings of April 28,

2025, the NIH writes in pertinent part,

> Thank you for the message (attached) dated June 28, 2023, regarding the
> allegations of sexual harassment and bullying against Dr. Giulio Pasinetti,
> Professor of Neurology. *We understand that Human Resources at the Icahn
> School of Medicine at Mount Sinai ("Mount Sinai") was unable to substantiate
> the allegations*, however, a Final Warning was issued to Dr. Pasinetti regarding
> his behavior towards trainees.

7

The NIH's Letter of Ratification went on to provide its approval for Dr. Pasinetti's demotion and noted to the Defendants the NIH's required prior approval of the taking of such demotion of Dr. Pasinetti.[4] Furthermore, the sham administrative trial proceeding and the Defendants' injunction opposition reveal that the Defendants, in conjunction with the NIH had gone about the process of taking and continuing adverse action against Dr. Pasinetti, not only without any process, but also without having ever provided Dr. Pasinetti any meaningful notice of the action of which he was effectively meaningfully unaware.

While the Defendants claimed to the NIH that Dr. Pasinetti had been meaningfully advised about the alleged quarterly climate check of his laboratory working environment, effectively a Performance Improvement Plan ("PIP"), it was not until November 15, 2024, that the Defendants had informed Dr. Pasinetti that he was to be placed in a PIP. The Defendants never provided Dr. Pasinetti's with information that he was being subjected to so-called quarterly climate checks until the underlying injunction proceedings, in which the Defendants disclosed such in their December 2024, opposition papers.

Additionally, the Defendants never informed Dr. Pasinetti that the alleged climate checks were a PIP, as they had been conducting the quarterly checks unbeknownst to Dr. Pasinett and introduced the November 15, 2024, PIP as an independent mechanism, separate from the alleged quarterly climate checks, which they had not yet then disclosed to Dr. Pasinetti.[5] Additionally, the sham administrative proceedings revealed on April 28, 2025, that on September 17, 2024, the

---

[4] The manner in which the NIH's correspondences with the Defendants concerning Dr. Pasinetti's removal was provided, show a confusing state of affairs among the Defendants. The emails between the two say that the demotion decision was that of the Defendants. However, the NIH's Letter of Ratification makes clear that such removal could only occur with the prior approval, and at the behest of the NIH. The confusion in-and-of-itself is likely owing to the absence of due process in the adverse employment action.

[5] During the sham administrative trial, Defendants, even as they testified that it was there policy to never disclose the existence of quarterly climates checks, presumably for purposes of trying to evaluate the exact nature of workplace, testified, lying, claiming that they had informed Dr. Pasinetti of his quarterly climate checks.

Defendants had requested from NIH a release of an income reduction restriction that had been imposed on Dr. Pasinett (i.e., adverse employment action) without any due process, before or after the reduction in income. Defendants latest action, the decision to proceed to terminate Dr. Pasinetti's employment, despite that literally nothing had changed[6] from the Defendants' notification to Dr. Pasinetti on November 15, 2024, that they would place him into a PIP, until January 10, 2025, when Mr. Pasinetti, had lacked crucial information because of the underlying lack of due process exercised his free speech rights, concerning government business, stating as follows,

> Dr. Walker [of the NIH] should be aware of what you are trying to do drag him into what you are doing is part of your unprofessional and retaliatory behavior and, indeed, something that will add to the long list of explanations you will have to give in court.

The Defendants, not more than five (5) days later, on or about January 15, 2025, commenced termination proceeding against Dr. Pasinetti, claiming that Dr. Pasinetti's expressing of his First Amendment activity in court, literally suing the Defendants to get answers for their conduct, was bullying, and therefore, terminable conduct. The due process notices, recommending Dr. Pasinetti's termination, and accepting and adopting the same, provided Dr. Pasinetti with no specific information, just purely conclusory claims.[7] Moreover, the Defendants would not make required disclosures until the 11th hour, when they demanded Dr. Pasinetti appear and defend himself at an April 28, 2025, administrative trial-like process, despite the lack of specific claims and 11th hour disclosures.

---

[6] The Defendants had effectively removed all of Dr. Pasinetti's employees. Therefore, there could be no claim that he had treated anyone any particular in his laboratory as he had been placed in a proverbial rubber room.
[7] Although the notices were communicated to Dr. Pasinetti on January 15, 2025, the notices are dated January 14, 2025.

Moreover, the Defendants' retaliation and hostile work environment resulted in their contacting the United States Department of Veteran Affairs ("VA"), a wholly independent entity, distributing to the VA the DRL and DAL and lobbying that the VA terminate Mr. Pasinetti's grant work with the VA. Subsequent to the filing of the First Amended Complaint, the Plaintiff learned that in contacting the VA, the Defendant Nestler, attempt to persuade VA Staff/Officials to join the Defendants, thereby turning against Dr. Pasinetti had informed such staff/officials "I do not trust Dr. Pasinetti's science." Thus, the Defendants elevated their defamatory and retaliatory against the Plaintiff to claim that Dr. Pasinetti was not a qualified doctor and scientist.

Mr. Pasinetti works for/at the VA conducting similar work, pursuant to NIH issued contracts. It is notable that, assuming *arguendo* that the Defendants' claims of the NIH's suspension of Dr. Pasinetti's work on any NIH contract at the Defendant school, has not occurred at the VA. That is, the NIH has not contacted the VA and instructed it to suspend Dr. Pasinetti's work on any NIH issued contracts.

Nonetheless, the Defendants, independent of and absent, the NIH's having contacted the VA, contacted and attempted to harass the VA's personnel in furtherance of gaining VA's suspension of Dr. Pasinetti's work at the VA on NIH issued contract. Moreover, the Defendants' harassment has spread to staff and employees who have and continue to work with Dr. Pasinetti in efforts to stop them. Dr. Pasinetti's claims illustrate that the Defendants are mismanaging government contracts.

For example, on the initial NIH Contract suspension, the Defendants feigned basis of removal comes in the last year of the $9 million contract, concerning about $1.5 million in remaining funds issued, in which the Defendants seek to removal Dr. Pasinetti despite his being the only persons with expertise to work on the study. Similarly, the Defendants removed an

important investigator affiliate of Dr. Pasinetti to work on the study, with all such removals resulting in individual defendants pocketing more money from the funds awarded, at the expense of the optimum quality of the government study.

During Injunction Proceedings, the Defendants effectively conceded the Plaintiff's initial claims that he had been subjected to adverse employment action, in having his work removed from him, based on bogus claims of wrongdoing that had allegedly occurred more than a year earlier (i.e., DRL and DAL), where the Defendants, in responding to the Plaintiff's underlying injunction application, submitted correspondences that revealed:

    (i.)    that the Defendants had informed the NIH that there was no evidence Dr. Pasinetti had engaged in the alleged wrongdoing that formed the basis of the Defendants DRL and DAL adverse employment action;

    (ii.)    that the Defendants, despite that admission to the NIH, had nonetheless continued telling Dr. Pasinetti that he was guilty of the alleged wrongdoing and that his adverse employment punishment[8] would be take an online class;

    (iii.)    that the Defendants had also informed the NIH of inarticulable claims of alleged bullying in Dr. Pasinetti's laboratory that the Defendants, until the injunction proceedings, had never informed Dr. Pasinetti of and of which they never clearly specified to the NIH, despite claiming that they were

---

[8] In hindsight, for contemporary times in which claims of sexual harassment are a terminable offense, the Defendants' punishment for Dr. Pasinetti, an online course, seemed out-of-step. However, the previously unrevealed revelation that the Defendants had admitted to NIH that the claims were not credible or no evidence they occurred, makes clear that the seemingly out-of-step punishment was because Dr. Pasinetti was not being punished for any wrongdoing. Rather, Dr. Pasinetti was being subjected to an action that were purely reflective of the Defendants' malice towards Dr. Pasinetti.

monitoring Dr. Pasinetti's for purposes of stopping the unspecified alleged bullying activity which they never revealed to Dr. Pasinetti.[9]

As a result of the underlying litigation, the Defendants, who already had Dr. Pasinetti in a proverbial rubber room in which he was literally unable to engage in any conduct, let alone employment-terminable conduct, moved to terminate the Plaintiff's employment, based on alleged new (non-existent) conduct. Furthermore, Defendants began terminating the Plaintiff's then stalled work, because of the underlying conduct, contacting the CDC in one instance, telling it that Dr. Pasinetti had informed the Defendants that he was resigning and wanted to resign from his role as a scientist on the stalled project, because he was transferring to the CDC.

Dr. Pasinetti had not told the Defendants any such information. In fact, amid such false claims to the CDC, Dr. Pasinetti had appealed the Defendants' recommendation of the termination of his employment, and an administrative trial on the basis for such termination, which to-date, the Defendants have not provided to Dr. Pasinetti. Moreover, despite the Defendants due process rules that mandate that persons appearing for employment termination must appear before a previously sitting panel, sitting for 2/3 year-terms, Defendants proceed to create a special handpicked panel, which the Defendants felt satisfied would rubber stamp its claims.

On or about February 27, 2025, the day before the alleged administrative trial, the Defendants provided Dr. Pasinetti's discovery for the administrative trial process. The discovery material revealed that, irrespective of the Defendants' feigned basis for Dr. Pasinetti's demotion

---

[9] The Respondent NIH became so unsure of what the Defendants were doing as to Dr. Pasinetti that the NIH demanded that the Defendants hire an outside agency to investigate and report on the alleged bullying. However, Defendants never meaningfully complied with that request, and Respondent NIH had not forced that compliance. Despite that noncompliance and enforcement, the Defendants proceeded to remove Dr. Pasinetti's work, lying to Dr. Pasinetti that the adverse employment action was (a) because of the underlying alleged claims of sexual harassment, and (b) that as a result thereof, the NIH demanded his removal because of such, both of which, as revealed in the underlying injunction proceeds, were admittedly not true.

in the grant process, and eventual seeking of his termination, such was done pursuant to the protocol of the NIH, as to persons working on governmental grants. Because the notices recommending Dr. Pasinetti's termination and the acceptance thereof, were constitutionally defective, for purposes of due process, providing no meaningful notice, at Dr. Pasinetti's sham administrative trial, Defendants shifted their alleged basis for Dr. Pasinetti's termination, claiming that they decided to terminate Dr. Pasinetti's employment pursuant to the January 14, 2025, notices, because he allegedly refused to participate in a November 15, 2025, proposed Performance Improvement Plan ("PIP"), even though that was not true and there had been no warning alleging the same, as such was certainly not contained in the notices dated January 14, 2025.

Therefore, Dr. Pasinetti moves for denial of the Defendants' motion to dismiss and to further amend the complaint.

## STANDARD OF REVIEW

"To survive a motion to dismiss under *Rule 12(b)(6)*, a pleading must set forth 'enough facts to state a claim to relief that is plausible on its face.'" *Bell Atl. Corp. v. Twombly, 550 U.S. 554, 570 (2007)*; *Lombardo v. Town of Hempstead, 2020 WL 7249290, *2-3 (E.D.N.Y. 2020)*. "A claim has facial plausibility when the Plaintiff pleads factual content that allows the Cour to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)*; *Lombardo, 2020 WL 7249290, at *3*.

On a motion to dismiss, the Court must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *LaFaro v. New York Cardiothoracic Grp., PLLC, 570 F.3d 471, 475 (2d Cir. 2009)*; *Lombardo 2020 WL 7249290, at 3*. In doing so, the Court the court may also consider documents attached to the

13

complaint or incorporated therein, by reference, matters of which judicial notice may be taken, and documents upon whose terms and effect [upon which] the complaint relies heavily." *Calcutti v. SBU, Inc., 273 F.Supp.2d 488, 498 (S.D.N.Y. 2003)*; *Miotto v. Yonkers Pub. Sch., 534 F.Supp.2d 422, 425 (S.D.N.Y. 1008)*.

## ARGUMENT

### POINT ONE

**THE COURT SHOULD DECIDE THAT THE DEFENDANTS ARE STATE ACTOR, WHO VIOLATED THE PLAINTIFF'S FIRST AMENDMENT RIGHTS.[10]**

The Defendants were state actors, acting in violation of the Plaintiff's First Amendment right to speak freely.

A claim for First Amendment retaliation depends on the factual context form which it stems. *Williams v. Town of Greenburgh, 535 F.3d 1, 76 (2d Cir. 2008)*. As such, the employee must prove (1) he has an interest protected by the First Amendment; (2) the defendants' actions were motivated by or substantially caused by his exercise of that right; and (3) the defendants' actions effectively chilled the exercise of his First Amendment right. *Schurbert v. City of Rye, 775 F.Supp.2d 689, 710 (S.D.N.Y. 2011)*. Plaintiffs must allege that the retaliatory conduct either silenced plaintiff, or had some actual, non-speculative chilling effect on plaintiff's speech. *Williams v. Town of Greenburgh, 535 F.3d 71, 78 (2d Cir. 2008)*.

The First Amendment's free speech clause protects one's right to file a complaint, commencing legal proceedings. *Doe v. City of New York, 2020 WL 108265, *6 (E.D.N.Y., Jan. 9, 2020)*. Generally, "government-action" for purposes of invoking due process guarantees, does

---

[10] As noted at the outset, the Defendants initially consented to the filing of an amendment, which did not specify which of the amended complaints they Defendants had consented to being filed. However, the importance of that ambiguity is that the Third Amendment complaint attached thereto provides the Defendants' admissions during the peer review proceedings, which amount to their admissions of being state actors.

not include actions by private actors unless (a) the private actor acted with knowledge of and pursuant to governmental requirements, and (b) the underlying adverse action is attributable to the government. *Id.* Thus, to state a claim for relief, a plaintiff must establish that he or she was deprived of a right secured by the Constitution or laws of the United States, *and* that the alleged deprivation was committed under the color of state law. *Id. at 49-50*. The "under-color-of-state-law" requirement excludes merely private conduct. *Id.*; *Blum v. Yaretsky, 457 U.S. 991, 1002 (1982)*; *Shelley v. Kraemer, 334 U.S. 1, 13 (1948)*.

Faithful application of the government-action requirement ensures that the prerogative of regulating private businesses remains with the government and respective branches, not the courts. *Id. 526 at 52*. Therefore, private businesses will not be held to constitutional standards unless there is a sufficiently close nexus between the respective regulating government entity and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the government itself. *Id.* "Whether such a 'close nexus' exists, our cases state, depends on whether the [government entity] 'has exercised coercive power or has provided such significant encouragement, either over or covert, that the choice must in law be deemed to be that of the State." *American Mfrs. Mut. Ins. Co., 526 U.S. at 52*; *Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 173 (1972)*. That is, it must be the case that the government entity compelled the underlying action or was directly involved in the underling process. *Id.*

<u>In the instant action</u>, the Defendants acted pursuant to the business of the United States government, alleging that they were punishing the Plaintiff for engaging in misconduct in relation to grant work of the United States Government. Moreover, the Defendants' removing of the Plaintiff from his grant work, was within three months of his having filed a lawsuit against the Defendants for violating his right rights to due process, and Defendants' move to terminate

the Plaintiff's employment was within several days of the Plaintiffs having mentioned to the fellow employees and the Defendants that he had sued them in court in a dispute over the truth of the underlying allegations.   Therefore, the Court should decide that the Defendants are, as a matter of law, state actors, and that as such, Defendants violated the Plaintiff's first amendment rights.

**POINT TWO**

**THE COURT SHOULD DECIDE THAT THE PLAINTIFF HAS STATED A CLAIM OF DEFAMATIOMN *PER SE*.**

The Defendants' deliberate and malicious statements, attempting to assail the Plaintiff in his profession, cannot be resolved on a motion dismiss, given its heavy factual context.

Resolving a factual dispute concerning the elements of defamation may not done on a motion to dismiss. *Expeditions Unlimited Aquatic Enterprises, Inc. v. Smithsonian Inst., 566 F.2d 289, 291 and FN.3 (D.C.C. 1977).* (*See Liguori v. Alexander, 495 F.Supp. 641, 648 (S.D.N.Y. 1980)*, citing *Smithsonian* for the proposition that resolving a factual dispute of elements of defamation on a motion to dismiss is improper.) <u>*In the instant case*</u>, Defendants resort to a heavy factual argument, contending that the Court should resolve the matter on their motion to dismiss.

However, the very in-depth factual contextual argument undermines the Defendants' argument. Whether the Defendants were purely stating their opinions, or engaged in a malicious conspiracy to assail the Plaintiff's in his profession is a factual dispute that cannot be resolved on a motion to dismiss.

Therefore, the Court should deny this branch of the Defendants' motion to dismiss.

16

## POINT THREE

**THE COURT SHOULD DECIDE THAT THE PLAINTIFF HAS STATED A CLAIM OF TORTIOUS INTERFERENCE.**

The Defendants effectively concede the elements of the Plaintiff's claim of tortious interference of a contract.

"Tortious interference, however, can take any forms." *NBT Bancorp., Inc. v. Gleet/Norstar Financial Group, Inc., 87 N.Y.2d 614, 664 N.E.2d. 492, 641 N.Y.S.2d 581 (N.Y. 1996)*. As such, a subset of the amorphous tort presents a wide range of possibilities. *Id.* Therefore, one may have committed tortious interference (i.e., breach) when it has fraudulently interfered with the performance of a third-party. *KGK Jewelry LLC v. ESDNetwork, 2013 WL 105780 (S.D.N.Y., Jan. 9, 2013)*.

<u>In the instant case</u>, the Court should deny this branch of the Defendants' motion to dismiss as required for purposes of the extent of the underlying breach. The parties engage in federal grant contracts, the ebbs, and flows of which are heavily influenced by the Defendants who were actively engaged in an unlawful campaign to stop the Plaintiffs grant work, as alleged in the complaint.

Therefore, the Court should deny this branch of the Defendants' motion to dismiss.

## POINT FOUR

**THE COURT SHOULD DECIDE THAT THE PLAINTIFF HAS STATED A CLAIM FOR EMOTIONAL DISTRESS.**

The Plaintiff's mental harm caused by the Defendants' breach of their fiduciary duty of the parties' employee-employee relationship, to act in the parties' mutual best interest, and not pursuant to the Defendants' baseless persona anonymous, resulting Defendants' campaign to destroy the Plaintiff's reputation, gives rise to a clam for emotional distress.

17

"Recovery for negligent infliction of 'purely mental suffering' is permitted when the circumstances of the case provide a guarantee of the genuineness of the claim…[provided that] the alleged emotional distress is reasonable, given the situation presented. *Doner v. Ed Adams Contracting Inc., 208 A.D.2d 1072, 617 N.Y.S.2d 565 (N.Y. App. Div. 1994)*. <u>*In the instant case*</u>, the Defendants' claims that the SAC does not articulate what duty the Defendants' breached are untrue. For instances, the complaint clearly alleges that the Defendants informed the NIH that that claims of sexual harassment against the Plaintiff were not founded. Then, without any change in circumstances, except that the Plaintiff had sued the Defendants, they used the claims that informed the NIH had been unfounded, but nonetheless, hidden from the Plaintiff that the Defendants had so informed the NIH the claims were unfounded.

That factual basis, by itself articulates that the Defendants had (a) violated the Plaintiff's First Amendment rights in retaliation, and (b) lied to the Plaintiff when they were required to be truth, was required by the parties' employee-employer fiduciary relationship (i.e., special relationship).

**POINT FOUR**

**THE COURT SHOULD DECIDE THAT THE PLAINTIFF HAS STATED A CLAIM FOR WHISTLEBLOWING.**

The Plaintiff's SAC duly states a claim of whistleblowing.

<u>*In the instant case*</u>, the Plaintiff's motion to further file a third amended complaint ("TAC") based on new evidence establishing that the Defendants were state actors working on federal contracts. Moreover, the Plaintiff's June 2024, complaint establishing that the Defendants misusing the government funds they were receiving, for purposes of their own personal gain, to the detriment of the U.S. Government to have their best and brights working on the scientific

18

government contracts. The complaint need not use the words "whistleblowing" to constitute whistleblowing.

Therefore, the Court should deny this branch of the Defendants' Motion to Dismiss.

## **CONCLUSION**

Plaintiff will rely upon for the foregoing in opposing all of the Defendant's arguments

and that the Court should deny the Defendant's motion to dismiss in its entirety.


_____
                                    E. Dubois Raynor, Jr.